**Donald and Edyth JENSEN, Keith and Sharon Jensen, Leonard and Rebecca Gardenour, Bill and Mary Ann Reed, Rick and Mary Hauber, Peter and Betty Cotterill, Appellants–Plaintiffs,[1]**

v.

**The CITY OF NEW ALBANY, Indiana; The New Albany, Indiana, Plan Commission; The New Albany, Indiana, Board of Zoning Appeals; and the Community Housing Development Organization, Inc., Appellees–Defendants.**

No. 22A01–0605–CV–181.

Court of Appeals of Indiana.

June 15, 2007.

Schlotman sat on the table. However, Schlotman testified there had been chairs at the table on prior occasions.

1. Plaintiffs Leonard and Rebecca Gardenour, Bill and Mary Ann Reed, Rick and Mary Hauber, and Peter and Betty Cotterill are not seeking relief on appeal. Pursuant to Indiana Appellate Rule 17(A), however, a party of record in the trial court is a party on appeal.

David A. Lewis, Jeffersonville, IN, Attorney for Appellants.

Shane L. Gibson, Gibson Law Office, LLC, New Albany, IN, Attorney for Appellee, City of New Albany.

Keith D. Mull, Mull & Heinz, LLC, New Albany, IN, Attorney for Appellee, Community Housing Development Organization, Inc.

## OPINION

VAIDIK, Judge.

### Case Summary

Donald Jensen, Edyth Jensen, Keith Jensen, and Sharon Jensen (collectively "Appellants") appeal the trial court's judgment in favor of the City of New Albany, Indiana, the New Albany Plan Commission, the New Albany Board of Zoning Appeals, and the Community Housing Development Organization, Inc. on Appellants' Complaint for Declaratory Judgment and Injunction. Specifically, Appellants contend that the trial court erred in refusing to enforce the reversionary clause in a deed. Because the deed transferred the subject real estate to the State, an entity with the power of eminent domain, the reversionary clause is not enforceable. We therefore affirm the judgment of the trial court.

### Facts and Procedural History

On August 17, 1935, Catherine R. Fawcett ("Fawcett") executed a warranty deed ("1935 Deed") conveying 5.82 acres of real estate ("Fawcett Property") to the City of New Albany, Indiana ("the City"), "to have and to hold so long as said real estate shall be used as a Municipal Park and Golf course and with the provision that no picnic parties are to be allowed on said real estate." Appellants' App. p. 296. The 1935 Deed further states: "Upon said real estate ceasing to be used for the purposes above mentioned then the title to said real estate shall revert to and become vested in said Grantor, her heirs and assign[s] [2]." *Id.* Beginning in 1935, the Fawcett Property was used as a small part of the Valley View Golf Course. Fawcett died in 1939.

Around 1960, the State began preparing for the construction of part of Interstate 64 ("I-64") through New Albany. As part of the project, the State determined that it needed Valley View Golf Course and surrounding land, including the Fawcett Property. The State agreed to purchase the necessary land from the City for $284,525.00. Because Fawcett had deeded the Fawcett Property to the City for use as a municipal park and golf course and subject to a reversionary interest, the Indiana Attorney General's Office prepared a quitclaim deed ("1960 Deed") by which Fawcett's daughter and sole heir, Edyth Fawcett Peters ("Peters"), conveyed certain real estate, including the Fawcett Property, to the Indiana Highway Commission ("Highway Commission"), and the City paid Peters the sum of $1600.00. During a Parks Board meeting on November 3, 1960, an attorney for the Parks Board stated, "The grounds with reversionary interest I have deeds prepared and held by the Attorney General of the State of Indiana and there will be a further reduction of $4200.00 from the gross amount we will have to pay for this title." *Id.* at 373 (Minutes of November 3, 1960, Parks Board Meeting).

The 1960 Deed purported to convey three parcels to the Highway Commission.

---

**2.** The 1935 Deed actually included the word "assigned." Appellants' App. p. 296. The parties agree that the drafter intended to use the word "assigns." "Heirs and assigns" is an identifier commonly used in real estate transactions. *See* Black's Law Dictionary 741 (8th ed.2004).

The provision conveying the Fawcett Property largely mirrors the 1935 Deed:

> [T]o have and to hold so long as said real estate shall be used as a municipal park and golf course and with the provision that no picnic parties are to be allowed on said real estate. Upon said real estate ceasing to be used for the purposes above mentioned then the title to said real estate shall revert to and become vested in said Grantor, her heirs and assigns.

*Id.* The 1960 Deed also states "that Catherine R. Fawcett died in Floyd County, Indiana, in 1939, leaving as her sole and only heir at law, her daughter, Edyth Fawcett Peters, the Grantor herein, and that said Grantor is now the owner of all right of reversion in the above described real estate." Id. at 452–53. On December 8, 1960, the Floyd Circuit Court ordered the payment of the $1600.00.[3] On August 26, 1961, the City executed a deed conveying certain real estate, including the Fawcett Property, to "the State of Indiana on behalf of the Indiana Highway Department." Id. at 297. Construction of I–64 lasted from 1961 through 1968 and only affected a small part of the Fawcett Property, leaving 5.531 of the original 5.82 acres intact. The remaining Fawcett Property was used for recreational purposes from 1969 through approximately 2004. In 1983, a baseball field was dedicated on the Fawcett Property, and the area became known as McLean Park.

In 2004, Floyd Memorial Hospital in New Albany sought to expand its medical facilities to an adjacent residential area. The hospital purchased several houses in the area and donated them to the Community Housing Development Organization, Inc. ("CHDO"), which planned to move the houses away from the site of the hospital expansion. CHDO eventually sought to move the houses to McLean Park. On November 29, 2004, the State executed a quitclaim deed ("2004 Deed") returning certain real estate that it had acquired for the I–64 project but not used, including the Fawcett Property, to the City. The 2004 Deed stated that "the above described real estate will not be needed for highway purposes or purposes incidental thereto within a reasonable time in the future" and that "the Excess Land will be used by the City of New Albany for the improvement and development of City programs[.]" Id. at 311. Sometime during the fall of 2004, CHDO bulldozed approximately 200 trees at McLean Park and began moving in houses from the hospital expansion site.

In the midst of the hospital expansion project and CHDO's acquisition of McLean Park, Appellants filed a Complaint for Declaratory Judgment and Injunction ("Complaint") against the City, the New Albany Plan Commission, the New Albany Board of Zoning Appeals, and CHDO. According to the Complaint, "The Plaintiffs are citizens of New Albany who are persons interested under [the 1935 Deed] in that they are beneficiaries and users of the municipal park and recreational area created by the deed." Id. at 13. One of the plaintiffs/Appellants, Edyth Jensen, is Fawcett's great granddaughter, and another, Keith Jensen, is Fawcett's great-great grandson. The Appellants sought, in part, "an order of the court declaring that the City does not have any right to allow the use of the [Fawcett Property] for any purpose other than that stated in the deed without causing the property to revert

---

**3.** The trial court directed that the payment be made to Fawcett. *See* Ex. p. 125. However, as we know, Fawcett died in 1939.

back to the rightful heirs and assigns of [Fawcett]." *Id.* at 15.

Less than a month before trial, the City, the New Albany Plan Commission, and the New Albany Board of Zoning Appeals filed a motion for summary judgment. On November 22, 2005, the trial court held both a hearing on the motion for summary judgment and a bench trial. The 1960 Deed was not submitted into evidence. After the hearing and the trial, the parties submitted proposed findings of fact and conclusions of law.

On December 15, 2005, the day after it filed its proposed findings of fact and conclusions of law, the City filed a Motion to Re–Open Evidence and Designation of Evidence. The City sought to submit the 1960 Deed as "newly discovered evidence." *Id.* at 444. The trial court allowed the 1960 Deed to be submitted as evidence and gave the parties time to submit additional findings of fact and conclusions of law. On January 13, 2006, the trial court entered an order denying the defendants' motion for summary judgment but also denying Appellants' request for declaratory judgment and an injunction. The order included the following relevant findings:

4. The City of New Albany owned the Fawcett [P]roperty as of August 17, 1935 subject to certain conditions. The City did convey this property and others to the State of Indiana in lieu of an eminent domain case so that the State of Indiana could build Interstate I–64. There was no dispute that the taking of the Fawcett [P]roperty, as well as other adjacent property was for a public purpose.

5. When this property was transferred to the State of Indiana for the building of I–64, the reversionary clause of the deed of 1935 was extinguished.

\* \* \* \*

5 [4]. While there is a difference between a negative restrictive covenant on a deed of real property and a reversionary clause in a deed conve[y]ing real property, neither is "enforceable against an entity with the power of eminent domain." *Dible v. City of Lafayette,* [713 N.E.2d 269 (Ind.1999) ].

6. If the entities with the power of eminent domain violate the right of a property owner, that is the right to have land revert to the Fawcett heirs, then there may be a taking which entitles potential property owners, that is the Fawcett heirs, to seek compensation.

7. The newly discovered stipulated evidence established that a Fawcett heir did quitclaim in October of 1960 any reversionary interest in the Fawcett [P]roperty and that said heir was compensated for the taking of any remaining real estate rights.

*Id.* at 475–76. Appellants then filed a Motion to Correct Error, which the trial court denied. This appeal ensued.

## Discussion and Decision

On appeal, Appellants raise several issues, including issues regarding the interpretation of the 1960 Deed. However, we find one issue to be dispositive: whether the trial court correctly determined that this case is controlled by the Indiana Supreme Court's opinion in *Dible v. City of Lafayette,* 713 N.E.2d 269 (Ind.1999). The facts relevant to this issue are not in dispute. As such, we are presented with a pure question of law, which we review *de novo*. *State Bd. of Tax Comm'rs v. Ispat*

---

**4.** The trial court mistakenly included two sets of Findings of Law 3, 4, and 5. That is, Findings of Law 3, 4, and 5 were followed by Findings of Law 3, 4, and 5. *See* Appellants' App. p. 475–76.

*Inland, Inc.,* 784 N.E.2d 477, 480 (Ind. 2003). We agree with the trial court that *Dible* controls the outcome of this dispute.

At first glance, this may seem like a very straightforward case. Around 1960, the State determined that it needed the Fawcett Property for the construction of I–64. The State prepared a deed—the 1960 Deed—by which it would receive the Fawcett Property and Peters would receive $1600.00 from the City, ostensibly to extinguish her reversionary interest in the property, which was the only interest she held at the time. But this is where the story takes a confusing turn. In preparing the 1960 Deed, the State included the following provision regarding the Fawcett Property:

> [T]o have and to hold so long as said real estate shall be used as a municipal park and golf course and with the provision that no picnic parties are to be allowed on said real estate. Upon said real estate ceasing to be used for the purposes above mentioned then the title to said real estate shall revert to and become vested in said Grantor, her heirs and assigns.

Appellants' App. p. 452. Strikingly, the deed by which the State acquired the Fawcett Property for the construction of I–64 also contains a reversionary clause requiring that the Fawcett Property be used as a municipal park and golf course. On appeal, Appellants seize upon this reversionary language.

■ The trial court, without even mentioning the reversionary clause in the 1960 Deed, determined that this case is controlled by our Supreme Court's opinion in *Dible.* We must agree.

■ In *Dible,* the plaintiffs owned property that was subject to a restrictive covenant reserving a utility easement. The City of Lafayette accepted responsibility for the utility easement then undertook a construction project that allegedly exceeded the easement and violated the restrictive covenant. The plaintiffs sought to enforce the restrictive covenant against the City of Lafayette, asking for an injunction requiring the City to remove the portions of the construction project that exceeded the utility easement. Our Supreme Court held:

> Such a covenant is not enforceable against an entity with the power of eminent domain-at least to the extent that the entity's use is for a public purpose. But if that entity's use violates the restrictions of the covenant, there is a taking that entitles the owners to compensation.

*Id.* at 273. In so holding, the Court noted parenthetically that enforcing a restrictive covenant against a condemning authority would defeat the purpose of eminent domain. Id. (citing *Carolina Mills v. Catawba County Bd. of Educ.,* 27 N.C.App. 524, 219 S.E.2d 509, 511 (1975)). The lesson of *Dible* is that when a condemning authority acquires land encumbered by a restriction on its use, that restriction cannot be enforced against the condemning authority as long as that entity's use is for a public purpose; the only remedy for a violation of that restriction is monetary compensation. Appellants contend that *Dible* is inapplicable to the instant case for three reasons.

Appellants note that neither the State nor the City has ever exercised its power of eminent domain with regard to the Fawcett Property. Appellants apparently believe that the rule in *Dible* is limited to those situations in which a condemning authority has actually exercised its power of eminent domain. This is not the case. The question is not whether an entity condemned property, but whether the entity had the power to do so, the rationale being that if the property owner refused to sell

the property, the condemning authority would simply exercise its power of eminent domain. *See Carolina Mills*, 219 S.E.2d at 511 ("The Board's power to purchase property . . . is tantamount to the power of eminent domain."). This explains the *Dible* Court's reference to entities "with the *power* of eminent domain." 713 N.E.2d at 273. (emphasis added). Here, as the trial court noted, the State purchased the land it needed for I-64, including the Fawcett Property, "in lieu of an eminent domain case[.]" Appellants' App. p. 475. Because the State would have exercised its power of eminent domain even if Peters had not sold her reversionary interest, the fact that the State negotiated the purchase of the land it needed does not make the reversionary clause enforceable.

Appellants also maintain that *Dible* does not control the resolution of this dispute because it concerned a restrictive covenant, while our concern here is a possibility of reverter. This distinction is immaterial in the context of this case. In *Dible*, our Supreme Court noted that enforcing a restrictive covenant against a condemning authority would defeat the purpose of eminent domain. 713 N.E.2d at 273 (citing *Carolina Mills*, 219 S.E.2d at 511). It is axiomatic that enforcing a reversionary clause against a condemning authority would have the same effect. If the reversionary clause would have been enforced against the State, it would have been unable to build I-64 as planned. Indeed, it is apparent that the State purchased the Fawcett Property with the specific intent of *extinguishing* the reversionary clause. During a Parks Board meeting on November 3, 1960, an attorney for the Parks Board noted that some of the land that the State needed for I-64 was subject to reversionary interests, that the Attorney General's Office had prepared deeds with regard to this land, and that some of the money paid by the State to the City would be used "to pay for this title," i.e., to extinguish the reversionary interests. Appellants' App. p. 373 (Minutes of November 3, 1960, Parks Board Meeting).

■ Furthermore, Appellants' own argument reveals the similarity between restrictive covenants and possibilities of reverter in this specific context. Appellants direct us to Black's Law Dictionary, which defines a restrictive covenant as "[a] private agreement, usually in a deed or a lease, that restricts the use or occupancy of real property, especially by specifying lot sizes, building lines, architectural styles, and the uses to which the property may be put." Black's Law Dictionary 393 (8th ed.2004). The reversionary clause in this case is exactly that: a private agreement in a deed that restricts the use or occupancy of real property by specifying the uses to which the property may be put. Appellants themselves state, in a different section of their brief, "Real covenants are agreements relating to real property that obligate a party to do or not do a particular act. *The Reverter Clauses are, therefore, covenants.*" Appellants' Br. p. 24 (citation and footnote omitted) (emphasis added). We do not deny that there are significant distinctions between restrictive covenants and possibilities of reverter in other contexts. But in the context before us, those distinctions are irrelevant. A possibility of reverter is just as unenforceable against a condemning authority as a restrictive covenant.

Next, Appellants assert that *Dible* is inapposite because, whereas our Supreme Court held that a restrictive covenant is not enforceable against an entity with the power of eminent domain as long as the entity's use is for a public purpose, *id.*, "CHDO desires to take the Fawcett Property for a private use, not a public purpose," Appellant's Br. p. 18. However, we

need not reach the issue of whether the CHDO's acquisition of the Fawcett Property in 2004 and 2005 was for a "private use" or a "public purpose." Rather, our focus is on whether the State's acquisition of the Fawcett Property in 1960 and 1961 was for a public purpose. Appellants do not dispute that the State's acquisition of the Fawcett Property for the construction of part of I–64 was for a public purpose. Because the State's acquisition of the Fawcett Property extinguished Appellants' reversionary interest, Appellants had no stake in CHDO's acquisition of the property in 2004 and 2005.[5]

Because we base our decision on *Dible* and the principle that a reversionary clause cannot be enforced against an entity with the power of eminent domain, we need not address any of Appellants' arguments concerning deed interpretation. No matter how we interpret the 1960 Deed, the reversionary clause cannot be enforced against the State. Nonetheless, we note that to enforce the clause would be to defeat the purpose of the State's acquisition of the Fawcett Property. In other words, if we were to enforce the reversion-ary clause in the 1960 Deed, we would have to conclude that the State violated the clause the instant it initiated construction of I–64 on part of the Fawcett Property, the very purpose for which it acquired the property. Likewise, to give force to the reversionary clause would be to render the $1600.00 payment to Peters completely meaningless. The only interest Peters held in the Fawcett Property was the possibility of reverter, and if she was not surrendering that interest, then why was she paid $1600.00?[6] "[T]he law looks through form to substance and will give effect to the real and dominant intention of the parties when definitely ascertained." *Kerfoot v. Kessener*, 227 Ind. 58, 84 N.E.2d 190, 199 (1949); *see also Brademas v. Hartwig*, 175 Ind.App. 4, 369 N.E.2d 954, 957 (1977).

The reversionary clause in the 1960 Deed is unenforceable. As such, Appellants had no stake in CHDO's acquisition of the Fawcett Property in 2004 and 2005. We therefore affirm the judgment of the trial court.

Affirmed.

---

5. Appellants assert that their reversionary interest in the 5.531 acres of the Fawcett Property that the State did not use for the construction of I–64 was revived five years after the State acquired the property because the State did not use it "for the public purpose for which it was taken." Appellants' Br. p. 20. In support of this argument, Appellants direct us to Indiana Code § 32–24–1–15(a)(4) (2004), which provides:

   If the person seeking to take property under this article fails to take possession of the property and adapt the property for the purpose for which it was acquired not later than five (5) years after the payment of the award or judgment for damages, except where a fee simple interest in the property is authorized to be acquired and is acquired, the person seeking to acquire the property forfeits all rights in the property as fully and completely as if the procedure to take the property had not begun.

(Formatting altered). But the State *did* "adapt the [Fawcett Property] for the purpose for which it was acquired" within five years. It is true that not all of the Fawcett Property is, as Appellants put it, "under I64 pavement or part of I–64 right-of-way." Appellants' Br. p. 19–20. However, Appellants fail to cite any principle that says that any portion of land acquired by a condemning authority for a public project but not ultimately "used" for that project automatically reverts to the condemnee.

6. In their brief, Appellants argue at length about the adequacy of the consideration paid by the State for the Fawcett Property. *See* Appellants' Br. p. 29–32. However, Appellants' arguments ignore the fact that Peters was only giving up a possibility of reverter in the property, not a fee simple interest.

BARNES, J., concurs.

BAILEY, J., concurs with separate opinion.

BAILEY, Judge, concurring.

I concur with the majority's conclusion that the reversionary clause in the 1960 Deed is unenforceable. I write separately, however, because I disagree with the majority's analysis and conclusion in footnote five regarding the applicability of Indiana Code Section 32–24–1–15(a)(4) (2004).[7]

In response to the Appellants' contention that the State forfeited the Fawcett Property based on failing to utilize the land within five years, the majority concludes that the State did adapt a portion of the land within five years, preventing the reversion of the Fawcett Property to the condemnee. This conclusion assumes that the interest acquired by the State was not a fee simple interest, thus requiring the State to act within five years of acquisition. I disagree with this underlying assumption.

Indiana Code Section 32–24–1–15(a)(4) (2004), provides:

> If the person seeking to take property under this article fails to take possession of the property and adapt the property for the purpose for which it was acquired not later than five (5) years after the payment of the award or judgment for damages, except where a fee simple interest in the property is authorized to be acquired and is acquired, the person seeking to acquire the property forfeits all rights in the property as fully and completely as if the procedure to take the property had not begun.

Black's Law Dictionary defines fee simple as "an interest in land that, being the broadest property interest allowed by law, endures until the current holder dies without heirs; esp., a fee simple absolute." *Black's Law Dictionary* 648 (8th ed.2004). Although the definition denotes that fee simple is especially a fee simple absolute, the definition does not mean that fee simple is exclusively synonymous with the term fee simple absolute. In fact, there is a comment under the definition of fee simple absolute:

> Although it is probably good practice to use the word "absolute" whenever one is referring to an estate in fee simple that is free of special limitation, condition subsequent, or executory limitation, lawyers frequently refer to such an estate as a "fee simple" or even as a "fee."

*Id.* at 649 (quoting Thomas F. Bergin & Paul G. Haskell, *Preface to Estates in Land and Future Interests* 24 (2d ed.1984)).

Lawyers may use as shorthand "fee simple" or "fee" when they are truly speaking of a fee simple absolute. However, the term "fee simple" or "estate in fee simple" is a generic term. See Restatement (First) of Prop.: Intro. To Freehold Interests § 14 (1936). A fee simple is "the largest possible interest which one can create in land. It is regarded as of infinite or *potentially* infinite duration." 1 John A. Borron, The Law of Future Interests § 62 at 44 (3d ed.2002) (emphasis added). There are five types of "fee simple" estates recognized in Indiana. These are: (1) fee simple absolute; (2) fee simple determinable; (3) fee simple subject to a condition subsequent; (4) fee simple subject to an executory limitation; and (5) fee simple conditional. 12 West's Indiana Law Encyclopedia, Estates, ch. 2, § 4, p. 315 (2001).

In construing a statute, the primary task is to determine and give effect to the intent of the legislature. *Hendricks Coun-*

---

7. *See* op. at 531 n. 5.

*ty Bank & Trust Co. v. Guthrie Bldg. Materials, Inc.,* 663 N.E.2d 1180, 1183 (Ind.Ct.App.1996), *trans. denied.* When a statute is clear and unambiguous on its face, a court may not interpret the statute. *Id.* Rather, the court looks to the plain and ordinary meaning of the words and phrases in a statute to discern the legislative intent, although technical words and phrases having a peculiar and appropriate meaning in law shall be understood according to their technical import. Ind.Code § 1–1–4–1.

The language employed in a statute crafted by the legislature is deemed to have been used intentionally. *Parkview Hospital, Inc. v. Roese,* 750 N.E.2d 384, 386 (Ind.Ct.App.2001), *trans. denied.* Therefore, we must conclude that the legislature intentionally used the generic term of "fee simple."

Furthermore, the employ of the general term of "fee simple" comports with the purpose of the forfeiture statute. In the context of eminent domain, the condemnor or acquirer is not limited to taking only a fee simple interest in the land it wishes to utilize. Rather, it may seek to take a right-of-way, an easement, or any other interest in the land. *See* I.C. § 32–24–1–3(b)(2) (Before exercising the power of eminent domain the acquirer "must make an effort to purchase for the use intended the land, right-of-way, easement, or other interest, in the property.") and § 32–24–1–4(b)(3) (In filing a complaint for the determination of condemnation damages, the acquirer must state the "use the plaintiff intends to make of the property or right sought to be acquired.").

The effect of I.C. § 32–24–1–15(a)(4) is to require those authorized to use eminent domain proceedings for the acquisition of temporary[8] or limited-use[9] property interests to take action in the execution of their plan within a reasonable amount of time or face forfeiture of the temporary or limited-use property interest acquired by them. In other words, the statute is to prevent an acquirer from needlessly depriving the long-term property owner of the use of his own land for an indefinite period of time. If an acquirer obtains an interest in land of infinite or potentially infinite duration through the process of eminent domain, there would be no need to encourage or force the acquirer to hasten the utilization of the acquired land. Under such circumstances, a citizen is not being deprived of the use of their land; rather, the citizen has been paid fair compensation for the permanent transfer of their title to the land.

The estate granted in the present case is a fee simple determinable, which creates an estate in fee simple that can automatically expire upon the occurrence of a specified event. Restatement (First) of Prop.: Intro. To Freehold Interests § 44 (1936). Because the State acquired this interest in fee simple, the circumstances fall within the exception of I.C. § 32–24–1–15(a)(4), making the forfeiture statute inapplicable.

For these reasons, I write separately but otherwise concur fully in the majority opinion.

---

8. See, e.g., *Portland Natural Gas Transmission Sys. v. 19.2 Acres of Land,* 318 F.3d 279 (1st Cir.2003).

9. An example of a limited use interest is an easement. See *North Snow Bay, Inc. v. Hamilton,* 657 N.E.2d 420, 423 (Ind.Ct.App.1995) (Easements are limited to the purpose for which they are granted.).